UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                        |
METROPOLITAN HOSPITAL, INC.,            |        Case No. 1:09-cv-128
                                        |
        Plaintiff,                      |
                                        |
            v.                          |        HONORABLE PAUL L. MALONEY
                                        |
UNITED STATES DEPARTMENT                |
OF HEALTH AND HUMAN SERVICES,           |
                                        |
        Defendant.                      |
                                        |
_____

**OPINION and ORDER**

**Granting Plaintiff Hospital's Motion for Summary Judgment;**
**Denying Defendant HHS's Motion for Summary Judgment;**
**Holding that Plaintiff is Entitled to Damages, Interest, and Declaratory and Injunctive Relief;**
**Directing the Parties to File a Proposed Order Awarding Monetary Damages and Interest**


        This case concerns the federal government's reimbursement of a hospital for its provision

of medical services to low-income patients under Medicaid and Medicare.

        The court has federal-question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. §

1395oo(f)(1), because the complaint asserts claims under the Social Security Act, 42 U.S.C. §

1395ww(d)(5)(F) ("SSA"), and the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA").

Venue is proper under 28 U.S.C. § 1391(e)(3) and 42 U.S.C. § 1395oo(f)(1) because plaintiff

Metropolitan Hospital ("Metro") is located in this district. *See* Complaint filed February 13, 2009

("Comp") ¶¶ 6-7. Metro, a Michigan non-profit corporation operating in Grand Rapids, Michigan

since 1942, participates in the federal Medicare program. Defendant, the United States Department

of Health and Human Services ("HHS") Centers for Medicare and Medicaid Services ("CMS"), is an executive-branch agency which administers the Medicare and Medicaid programs. In this capacity, CMS issues and implements regulations governing so-called "disproportionate share hospital" ("DSH") adjustments to hospitals' Medicare reimbursement. *See* Comp ¶¶ 1-2 and 9-10.

Metro contends that CMS amended a DSH regulation, 42 C.F.R. § 412.106(b), in a way that is inconsistent with an SSA provision (42 U.S.C. § 1395ww(d)(5)(f)(vi)) and case law interpreting it. *See* Comp ¶¶ 2 and 4. In so doing, Metro claims, CMS acted in an arbitrary and capricious manner in violation of the APA, 5 U.S.C. §§ 706(2)(A) and 706 (2)(C). *See* Comp ¶ 5. Metro seeks an injunction barring the enforcement of the amended DSH regulation, a declaration of the proper method of calculating its DSH adjustments, and at least $2,179,740 in damages plus interest pursuant to 42 U.S.C. § 1395oo(f)(2). *See* Comp ¶¶ 5 and 8 and Prayer for Relief. The parties cross-moved for summary judgment, and the court heard oral argument on Monday, March 29, 2010.


**BACKGROUND**

In 1965, Congress enacted Title XVIII of the SSA, creating a federal health-insurance system for the elderly and the disabled known as Medicare. *See* 42 U.S.C. § 1395c *et seq.* Also in 1965, Congress enacted Title XIX of the SSA, known as Medicaid, to provide grants to States in order to provide medical assistance to families with dependent children and to elderly, blind, and disabled individuals whose income and resources are insufficient to pay for needed medical care. *See* 42 U.S.C. § 1396 *et seq.* Individuals who are eligible for taxpayer-funded benefits under both Medicare and Medicaid are known as "dual eligibles." *See* Comp ¶ 12.

Medicare's Hospital Insurance component, known as Part A, reimburses health-care

providers for certain expenses associated with inpatient hospital care. Generally, Medicare Part A is automatically provided to individuals over the age of sixty-five. Medicare Part A is also automatically provided to individuals of any age who have been disabled for more than twenty-four months, as long as they or their spouse worked for at least ten years in employment subject to the Medicare tax. *See* Comp ¶ 13 (citing 42 U.S.C. § 1395c).

Medicare Part A coverage is based on a benefit period or a "spell of illness", which is defined as the period during which a person is a hospital inpatient for an injury or illness, plus recovery time in a nursing facility or in home care. *See* Comp ¶ 14 (citing 42 U.S.C. § 1395x(a)). The benefit period begins the first day in hospital and continues until the patient has been out of the hospital for sixty consecutive days. *See* Comp ¶ 14 (citing 42 U.S.C. § 1395x(a)).

If the patient is in hospital for more than sixty days, Medicare Part A will pay only part of the cost for days 61 to 90. *See* Comp ¶ 14 (citing 42 U.S.C. § 1395e(a)(1)). After the patient has been in hospital for more than 90 days, Medicare Part A will not pay anything towards his care in hospital during that spell of illness. *See* Comp ¶ 14 (citing 42 U.S.C. § 1395d(b)).

In addition to full payment for days 1-60 in hospital and partial payment for days 61-90 in hospital, each Medicare beneficiary is entitled to a lifetime reserve of 60 additional days to be used at their option. *See* Comp ¶ 14 (citing 42 U.S.C. § 1395d(a)).

Medicare Part A payments are administered by "fiscal intermediaries", often private insurance companies, which contract with the federal government. The fiscal intermediary reviews and audits the information which a hospital provides in its annual cost report, and determines how much Part A reimbursement the federal government should pay to the hospital for services rendered to Medicare patients. *See* Comp ¶ 15 (citing 42 U.S.C. § 1395kk-1).

Several provisions in the Medicare statute adjust a hospital's reimbursement based on factors specific to the hospital. The DSH adjustment requires the federal taxpayers to provide additional reimbursement to hospitals which serve a "significantly disproportionate number of low-income patients." *See* Comp ¶ 16 (citing 42 U.S.C. § 1395ww(d)(5)(F)(i)(I)). A hospital's disproportionate-patient percentage ("DSH percentage") is the sum of two fractions – the Medicare fraction (a/k/a "Medicare proxy") and the Medicaid fraction (a/k/a "Medicaid proxy") – for the hospital's fiscal year. *See* Comp ¶ 17 (citing 42 U.S.C. § 1395ww(d)(5)(F)(vi)). In other words,

$$\textbf{DSH Percentage} \quad = \quad \textbf{Medicare Fraction} \quad + \quad \textbf{Medicaid Fraction}$$

The higher a hospital's DSH percentage, the higher the amount of its DSH reimbursement adjustment. *See* Comp ¶ 17 (citing 42 U.S.C. § 1395ww(d)(5)(F)(i)(I)).

**When calculating a hospital's Medicare fraction,** the numerator is the number of hospital patient days for patients who were "entitled to" both Medicare Part A and Supplemental Security Income ("SSI"), excluding patients who received state supplementation only. The Medicare fraction denominator is the number of patient days for patients who were "entitled to" Medicare Part A. *See* Comp ¶ 18 (citing 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)). In other words,

$$\textbf{Medicare Fraction} \quad = \quad \frac{\text{\# of Patient Days for People "entitled to" Medicare Part A and SSI (except State-only)}}{\text{\# of Patient Days for People "entitled to" Medicare Part A}}$$

**When calculating a hospital's Medicaid fraction,** the numerator is the number of hospital patient days for patients who were "eligible for" Medicaid but *not* "entitled to" Medicare Part A.

The denominator is the number of all patient days for the period. *See* Comp ¶ 96 (citing 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)). In other words,

**Medicaid Fraction** = $\dfrac{\text{\# of Patient Days for People "Eligible for" Medicaid but \underline{not} "entitled to" Medicare Part A}}{\text{\# of All Patient Days}}$

<u>The Changing Interpretation of a Term Used in Numerator of the *Medicaid* Fraction: Patients "Eligible For" Medicaid</u>

It is useful to review the history of the agency's interpretation of the phrase "patients *eligible for*" Medicaid, which appears in the numerator of the Medicaid fraction. Metro alleges that in the early 1990s, CMS interpreted the phrase "eligible for medical assistance [under Medicaid]" to include only days of care which Medicaid *actually* paid for, not all days of care provided to people who were eligible for Medicaid (including days for which Medicaid did *not* actually pay). *See* Comp ¶ 20. By reducing the numerator of the Medicaid fraction, this interpretation reduced a hospital's DSH adjustment.

**In 1994, the Sixth Circuit Court of Appeals rejected CMS's interpretation of the phrase "eligible for [Medicaid]" as including only days actually paid by Medicaid. The Court of Appeals held that the phrase "eligible for medical assistance [under Medicaid]" must include all days of care provided to people who were merely eligible for Medicaid, even if they did not actually receive Medicaid benefits for those days. *See Jewish Hospital, Inc. v. HHS*, 19 F.3d 270 (6th Cir. 1994)**, *reh'g & reh'g en banc denied* (6th Cir. May 16, 1994)**.** *Jewish Hospital*'s majority opinion was written by Judge Keith and joined by District Judge Anna Diggs Taylor. *Jewish Hospital* began by setting forth the DSH formula, the definition of the Medicare and

Medicaid fractions, and the Secretary's restrictive interpretation of a certain statutory term:

> Congress requires the Secretary of [HHS] to adjust Medicare Prospective Payment System (PPS) payments for hospitals that provide inpatient services to a disproportionate share of low[-]income patients. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Secretary's restrictive reading of the disproportionate[-] share adjustment serves as the basis for this appeal. Because the Secretary's interpretation is contrary to the clear mandate of the statute, we reverse . . . and remand the case to the Secretary for the proper calculation of the disproportionate share adjustment.

## I.    THE REGULATORY FRAMEWORK

* * *  As part of COBRA [1985], Congress provided that the PPS system pay hospitals a prospectively determined amount per discharge based on the costs that an efficiently operating hospital should incur to provide quality services to Medicare beneficiaries based on the patient's diagnosis at the time of discharge. *See* 42 U.S.C. § 1395ww. The statute also provides for the adjustment of these payments for hospitals that provide inpatient services to a disproportionate share of low[-]income patients. Congress sought to adjust the Medicare PPS system to recognize the higher costs incurred by hospitals that serve a large number of low[-]income patients.

A hospital must have a certain "disproportionate share percentage" to qualify for the Medicare adjustment at issue in the instant case. This percentage is defined as the sum of two fractions expressed as percentages and serves as a "proxy" for all low[-]income patients. The first fraction, termed the "Medicare Low Income Proxy," is based on the number of Medicare patients served by the hospital. The statute defines this proxy as follows:

> The numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled to benefits under* [*Medicare*] and who were *entitled to supplemental security income benefits* (excluding any State supplementation) under SSI, and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under [Medicare] . . . .

(emphasis added). *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The second fraction, termed the "Medicaid Low[-]Income Proxy", is based upon Medicaid-eligible patients. The statute defines this proxy as follows:

> the numerator of which is the number of said hospital's patient days for such period which consist of patients who (for such days) were

> *eligible for medical assistance under a State plan approved under subchapter XIX [Medicaid]*, but who were not entitled to benefits under [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

(emphasis added).  *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The Secretary promulgated the following regulation to implement the language of the Medicaid Low Income Proxy:

> Total Medicaid inpatient days will include all covered days attributable to Medicaid patients . . . .  Medicaid covered days will include only those days *for which benefits are payable under Title XIX*.  Any day of a Medicaid patient's hospital stay that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days.

(emphasis added).  Medicare Program, 51 FED. REG. 16,777 (1986).  The Secretary purports to interpret Congress' statutory phrase, "eligible for medical assistance under a State plan approved under Title XIX [Medicaid]" with its promulgated regulation.  The Secretary argues that only those days actually paid by Medicaid can be utilized in the calculation of the [Medicaid Low-Income] Proxy, [a/k/a Medicaid Fraction].  The Secretary's interpretation of the proxy is the subject of this appeal.

*Jewish Hospital*, 19 F.3d at 272.  In granting summary judgment to the Secretary, the district court

had written as follows:

> We [sic] believe that the statute supports the Secretary's interpretation.  However, even if that were not the case, we believe the most that can be said concerning the statute is that it is ambiguous.  The parties agree that if the statute is ambiguous, the Secretary can legally choose the interpretation.  We also are of the opinion that the statute, as drafted, by including the words, "for such days," means that the hospital may recover only for those days on which Medicaid patients were actually reimbursed.

> Had Congress intended the result sought by the plaintiff[,] it would have left out "for such days" and made it clear that all patients on Medicaid were to be counted as part of the numerator regardless of whether they were days on which Medicaid was actually paid.

*Jewish Hospital*, 19 F.3d at 273 (quoting district-court ruling, which panel rejected).  The panel next

set forth the deferential standard by which the courts must judge an agency's interpretation of a statute within its purview:

> \* \* \* In *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837 . . . (1984), the Supreme Court explained how a court should treat an agency interpretation of statutes within the agency's ambit.
>
>> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the *precise question at issue*. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the Court determines [that] Congress has not directly addressed the *precise question at issue*, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the *specific issue*, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> 467 U.S. at 842-43 . . . . (emphasis added). The Court went on to state that in determining whether an agency's answer is based on a permissible construction of a statute, a reviewing "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [of the statute] the court would have reached if the question had initially arisen in a judicial proceeding." 467 U.S. at 841 n.11 . . . .

*Jewish Hospital*, 19 F.3d at 273-274 (citations to intervening Sixth Circuit decision omitted).[1] The *Jewish Hospital* panel cautioned, however, that the *Chevron* standard did not call for unlimited or mindless deference to an agency's interpretation of a statute. The panel wrote as follows:

---

[1] "However, '[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.'" *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 409 (6th Cir. 2007) (C.J. Boggs, Batchelder, Griffin) (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)). "Thus, 'interpretive guidance from administrative agencies that is not the product of formal, notice-and-comment rulemaking is entitled to respect [only] 'to the extent that the interpretations have the power to persuade.'" *Bank of NY v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006) (quoting *Christensen*, 529 U.S. at 587 (internal citations and quotation marks omitted)).

The *Chevron* Court further stated, however, that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear legislative intent." *Chevron*, 467 U.S. at 843 n.9 . . . .

This Court also finds Judge Batchelder's discussion of *Chevron* in *Brown v. Rock Creek Mining Co.*, 996 F.2d 812 (6th Cir. 1993) (Batchelder, J., concurring), instructive. There, Judge Batchelder states:

> Where the regulation is clear and plain, not only is there no reason to let the Director offer an interpretation of it, and no reason to consult the legislative history, but there is every reason not to do so. First and foremost, of course, *Chevron* instructs that unless the statute's provisions are ambiguous, we are simply to give effect to the unambiguously expressed intent of Congress. 467 U.S. at 842-43 . . . . The reason for this requirement is obvious: through excursions into legislative history, a writer can find support for virtually any position.

[*Brown*, 996 F.2d] at 818. Accordingly, utilizing the frame work of *Chevron*, we must determine whether Congress spoke directly to this "specific issue." For if the intent of Congress is clear and the Secretary's interpretation of the statute is contrary to that intent, "that is the end of the matter . . . ." *Chevron*, 467 U.S. at 843 . . . .

*Jewish Hospital*, 19 F.3d at 274 (citations to intervening Sixth Circuit decision omitted). The *Jewish Hospital* panel concluded that the Secretary's interpretation of the Medicaid Fraction regulation was contrary to the clear congressional intent behind the clear language of the regulation's definition of the numerator. In a section entitled "The Legislative Mandate is Clear from the Statutory Language," the *Jewish Hospital* majority reasoned as follows,

> Congress enacted the disproportionate share adjustment to balance the inequities which exist for hospitals that treat a disproportionate number of low[-]income patients. Congress chose to address this problem with the Medicaid proxy and utilized the following phrase in its calculation:
>
> > The number of the hospital's patient days for such period which consist of patients who (for such days) were *eligible* for medical assistance under a State plan approved under title XIX [Medicaid].
>
> Looking to the plain language of the statute, the word "eligible" refers to whether a patient is <u>capable of</u> receiving federal medical assistance or Medicaid. There is no

indication from the text of the statute that Congress intended to impute any special meaning to the term, ["]eligible.["]. Additionally, the phrase, "the number of the hospital's patient days for such period," modifies the term eligible. Facially, this phrase speaks to the aggregate number of days for which a hospital provides Medicaid[-]eligible services. Thus, it appears that all days for which an individual is capable of receiving Medicaid should be figured into the proxy calculation.

The Secretary's regulation limits the calculation to those days for which a state actually renders payment of Medicaid benefits. Specifically, the Secretary extracts the parenthetical phrase "for such days" and argues that the phrase acts as a restrictive qualifier. ["]For such days["], according to the Secretary, thus takes on the meaning of "state[-]paid days"[, i.e.,] the actual duration of state[-]rendered Medicaid benefits.

The Secretary's interpretation runs counter to the language of the statute. First, the parenthetical "for such days" serves only as the antecedent to the initial phrase "the number of the hospital's patient days for such period." The parenthetical does *not* take on new meaning because it is restated in a different form or placed immediately prior to the term "eligible." The aggregate number of a "hospital's patient days" referred to in the proxy should thus remain unaltered.

Additionally, the notion of "eligibility" refers to the "qualification" for benefits or the capability of receiving such benefits. Congress explicitly refers to a period of eligibility equal to the time for which medical assistance [under Medicaid] was available. Congress, [by contrast], did not refer to the time period for which a given State actually renders Medicaid payment. Absent some affirmative statement to the contrary, this Court will not seek guidance for this crucial [sic] federal legislation in a state program that may be readily altered by state legislative fiat. Congress sought to structure a proxy that is definable and accessible, one that would not be subject to yearly budgetary constraints of individual states that may threaten a PPS hospital[']s ability to continue to provide services to low[-]income persons.

Furthermore, Congress spoke of "eligibility" in the Medicaid proxy and "entitlement" in the Medicare proxy. *See* 42 U.S.C. § 1395ww(d)(5)(F). The Secretary would have this court conflate eligibility with entitlement. Adjacent provisions utilizing different terms, however, must connote different meanings. To be *entitled* to some benefit means that one possesses the *right* or *title* to that benefit. Thus, the Medicare proxy fixes the calculation upon the absolute right ["entitled to"] to receive an independent and readily defined payment.

By way of contrast, the Medicaid proxy speaks solely of *eligibility*. While Congress intended to refer to the qualification for Medicaid benefits in the calculation of this proxy, Congress could not have intended to fix its calculation on the actual payment of benefits in the state[-]administered program. Had Congress intended that result,

it would have also defined the Medicaid proxy in terms of entitlement to state Medicaid payments. Rather, Congress defined the Medicaid proxy with respect to eligibility for and not actual payment of benefits.

*Jewish Hospital*, 19 F.3d at 274-75 (boldface and italics in original, underlining added for emphasis).

**Alternately, the *Jewish Hospital* majority held that even if the regulation defining the Medicaid proxy numerator were ambiguous or silent – allowing the agency to interpret the regulation – the Secretary's construction of the Medicaid proxy regulation was impermissible.** The majority reasoned as follows,

[T[he district court stated that "[t]he parties agree that if the statute is ambiguous, the Secretary can legally choose the interpretation." The district court and the parties slightly misstate the law. Note that *Chevron* instructs:

If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. *Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.*

(emphasis added). 467 U.S. at 842-43 . . . . Thus, after looking at the legislative history, the Secretary's interpretation must be permissible. We hold that, even if the language of the statute can be deemed silent or ambiguous, the Secretary's construction of the statute is *not* permissible. The legislative history of the Medicaid proxy clearly shows that the Secretary's construction is contrary to that intent expressed by Congress.

\* \* \*

\* \* \* In H.R. Report 3128, the legislative body defined "low income patient" as follows:

The term "low income patients" means, with respect to inpatient hospital services provided to a patient who was, or is determined to have been, entitled to medical assistance under Title XIX [Medicaid] with respect to some or all of such services during the hospital stay, and includes such an individual notwithstanding that some or all of such services were actually paid for under this title [Medicare].

-11-

The House thus defined the "proxy" or measure for approximating the disproportionate share as that "percentage of the hospital's total patient days attributable to [M]edicaid patients, including Medicaid-eligible Medicare beneficiaries – Medicare/Medicaid crossovers [i.e., dual eligibles]. The legislative history provides that the House of Representatives initially endorsed language that would count *all* days attributable to the Medicaid beneficiary, which is undoubtedly the best approximation of the presence of low-income patients.

Additionally, the legislative history makes it clear that the Senate worked primarily to define the low-income patients in terms of Medicare. Senate language described the proxy as "the percentage of a hospital's total Medicare Part A patient days attributable to [M]edicare patients who are also enrolled in the federal Supplemental Security Income (SSI) Program." Note that the present language of the Medicare proxy is substantially the same as that enacted by the Senate. Therefore, the legislative history of the Senate proceedings for COBRA sheds little light on the interpretation of the Medicaid proxy.

This Court thus finds that the House of Representatives acted to substantially define **the Medicaid proxy. Congress intended to include all days attributable to Medicaid beneficiaries in the proxy. Accordingly, an interpretation that is contrary to this intention must be stricken.**

The Secretary opined in 42 C.F.R. Part 412.06 that the Medicaid proxy should be calculated using only those hospital patient days which were specifically deemed payable by a state Medicaid program. [T]he Secretary's attempted limitation on the Medicaid proxy . . . fails to implement the will of Congress. The Secretary's interpretation is more restrictive than that intended by Congress and thus runs counter to the statutory language. Therefore, we hold that the Secretary's construction of the Medicaid proxy, as represented by its promulgated regulation[,] is impermissible.

*Jewish Hospital*, 19 F.3d at 275, 276 (italics in original, boldface and underlining added for emphasis).

In January 2001, HHS issued a Program Memorandum ("the 2001 memo") reversing its prior position and adopting the interpretation of the Medicaid-fraction regulation mandated by, *inter alia*, the Sixth Circuit. The 2001 memo directed that when calculating the Medicaid fraction, all days of care provided to Medicaid-eligible patients must be included in the numerator, regardless of whether Medicaid actually paid for the days. *See* Comp ¶ 22 (citing Health Care Financing Administration

("HCFA"), Program Memorandum for Beneficiaries: Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation, Transmittal A-01-13 (Jan. 25, 2001), at 1-2).

The Changing Interpretation of a Term Used in the Numerator of the *Medicare* Fraction.

Again, a hospital's DSH percentage is the sum of its Medicaid fraction and its Medicare fraction. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi). The court has already discussed the interpretation of the term "eligible for [Medicaid]" in the numerator of the Medic*aid* fraction, as clarified by the Sixth Circuit's 1994 decision in *Jewish Hospital* and the resultant 2001 HHS memo. Now we will discuss the interpretation of a term in the numerator of the Medic*are* fraction.

A hospital's Medic*are* fraction for a given time period is:

[the number of days for patients who were "entitled to" both Medic*are* Part A *and* SSI (excluding patients receiving only a State supplement)]

divided by

[the number of days for patients "entitled to" Medicare Part A]

*See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) and 42 C.F.R. § 412.106(b)(4). **Before October 1, 2004, the Medicare fraction regulation provided that the numerator was the number of "covered" days furnished to patients who were "entitled to" both Medicare Part A and SSI.** *See* Comp ¶ 25 (citing 42 C.F.R. § 412.106(b)(2)(i) (September 30, 2004).

In May 2003, CMS proposed a change in its interpretation of a term in the Medicare fraction numerator, without proposing a change in the text of the applicable regulation. *See* Comp ¶ 26 (citing 68 Fed. Reg. 27153, 27207 (May 19, 2003)). The proposed rule stated that CMS had been allowing hospitals to included "exhausted" Medicare days in the numerator of the Medicare fraction.

In other words, the proposed rule stated that CMS had been counting patients whose Medicare days were exhausted, as patients who were "entitled to" Medicare Part A.

But fifteen months later, CMS retracted the May 2003 statement and the proposal. CMS clarified that the Medicare fraction regulation had been limited expressly to "covered" Medicare Part A days, which did not include days for patients whose Medicare Part A days had been exhausted. *See* Comp ¶ 26 (citing 69 Fed. Reg. 48916, 49098 (Aug. 11, 2004)).

In August 2004, CMS published a final rule which deleted the word "covered" from the regulation determining the Medicare fraction numerator, 42 C.F.R. § 412.106(b)(2)(i), effective October 1, 2004 ("the amended regulation"). **Under CMS's interpretation, the amended regulation changed the significance of days of care provided to a "dual eligible" – someone eligible for both Medicare and Medicaid – who had exhausted his Medicare coverage, i.e., dual eligibles who were no longer "eligible for" Medicare. Namely, under CMS's interpretation of the amended regulation, days of care provided to exhausted dual-eligibles are counted in the Medi*care* fraction, not the Medi*caid* fraction.** *See* Comp ¶ 27.

PRRB Rulings Before and After the 2004 Amendment to the DSH Regulation.

Hospitals sometimes disagree with fiscal intermediaries about how DSH calculations should account for days of care to dual-eligibles who have exhausted their Medicare coverage (and whose care is therefore paid by Medi*caid*). Metro focuses on the difference in PRRB rulings in such disputes before and after the 2004 amendment to the DSH regulation. Before the amendment, the PRRB consistently ruled that the days of care provided to Medicare-exhausted dual-eligibles was part of the Medi*caid* fraction. *See* Comp ¶ 28. The PRRB reasoned that Congress intended days

of care to exhausted dual-eligibles to be counted in calculating the DSH percentage but such days could not be included in the Medi*care* fraction. *See* Comp ¶ 28 (citing PRRB rulings).

After the amendment, the PRRB continued to hold that Congress intended days of care to Medicare-exhausted dual-eligibles to be counted in calculating the DSH percentage. However, the PRRB began ruling that  that intent was satisfied by the amendment allowing dual-eligible Medicare-exhausted days to be included in the numerator of the Medi*care* fraction. *See* Comp ¶ 29 (citing PRRB ruling).

**Metro attacks the PRRB's post-amendment rulings as inconsistent with the acknowledged congressional intent to include all exhausted dual-eligible days in the calculation of the DSH percentage.** Metro objects to this interpretation of the amended regulation as follows:

> But the 2004 amendment does *not* result in the inclusion of <u>all</u> exhausted days in the DSH percentage calculation, because the numerator of the Medicare fraction (unlike the numerator of the Medicaid fraction) is expressly limited to the days of care for individuals who are also eligible for SSI payments. *Compare* 42 C.F.R. § 412.106(b)(2)(i) (Medicare fraction) with 42 C.F.R. § 412.106(b)(4) (Medicaid fraction).
>
> Many dual-eligible [Medicaid-and-Medicare-eligible] beneficiaries do not receive SSI payments. Under the amended regulation, the exhausted Medicare days of these dual-eligibles are included in neither the Medicare numerator nor the Medicaid numerator. They are thus entirely unaccounted for in the calculation of a hospital's DSH percentage.

Comp ¶ 29. Metro's first objection can be summarized as follows:

(1)     as the PRRB concedes before and after the amendment, Congress intended for the DSH percentage to reflect days of care provided to dual-eligibles who had exhausted their Medicare benefits;

(2)     yet under the amended regulation, the DSH percentage does not reflect the days of care provided to some Medicare-exhausted dual-eligibles, namely those Medicare-

exhausted dual eligibles who were not entitled to SSI.

**Metro has a second objection to the amended regulation as interpreted by CMS/PRRB:**

Pursuant to the amended regulation as applied by CMS and the PRRB, days of care for some dual-eligibles [people eligible for both Medicare and Medicaid] who are no longer "entitled to" Medicare coverage are counted in the numerator of the Medicare fraction.

[This contravenes] the federal statute providing that only the days of care for those "entitled to" [Medicare] Part A and SSI should be included [in the numerator of the Medicare fraction]. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

Conversely, days of care for dual-eligibles who are no longer "entitled to" Part A coverage are excluded from the numerator of the Medic*aid* fraction, notwithstanding the federal statute providing that the days of care for those "eligible for" Medicaid and not "entitled to" [Medicare] Part A benefits should be included therein. *See* 42 U.S.C. § 1395ww(D)(5)(f)(VI)(II).

Comp ¶ 30.  Metro's second objection to the amended regulation can be summarized as follows:

(1)     all patient-days for Medicare-exhausted dual eligibles should be counted in the Medic*aid* Fraction numerator;

(2)     the amended regulation counts some days for Medicare-exhausted dual eligibles in the Medic*are* Fraction numerator;

(3)     that violates the statute stating that only days for those entitled to both Medicare Part A *and* SSI may be included in the Medicare Fraction numerator;

(4)     in other words, the amended regulation counts the following patients in the Medicare Fraction numerator whom the statute does not allow to be counted there:  Medicare-exhausted dual eligibles who are entitled to SSI but no longer entitled to Medicare Part A.

The Specific Impact of the Regulation Amendment on Metro's DSH Adjustment.

-16-

In 1985 Metro established an Assisted Breathing Center ("ABC") to provide acute-care services to patients who depend on a ventilator. *See* Comp ¶ 31. ABC patients require ventilator services at least six hours every day; tend to have conditions such as diabetes, pneumonia, COPD, urinary tract infections, bowel conditions, and other physical or cognitive limitations; generally have medical needs that cannot be managed in a skilled-nursing facility; and are typically in the hospital for months or years while staff try to wean them from the ventilators. *See* Comp ¶ 31. Almost all of Metro's ABC patients are eligible for Medicaid.

As a prerequisite for authorizing a Medicaid patient to enter the ABC, the Michigan Department of Community Health ("Michigan DCH") requires that all Medicare benefits be exhausted and Medicaid is the only remaining payor for the patient's long-term care; therefore, Metro bills only Medicaid for care provided to ABC patients. *See* Comp ¶ 32. Accordingly, Metro has always counted ABC patients in the numerator of the Medic*aid* Fraction of its DSH percentage, i.e., patients who were "eligible for Medicaid but not entitled to Medicare Part A" per 42 C.F.R. § 412.106(B)(4). *See* Comp ¶ 33.


**PROCEDURAL HISTORY**

In keeping with that practice, Metro's Fiscal Year ("FY") 2005 Cost Report counted Medicare-exhausted dual-eligible patients in the Medicaid Fraction. *See* Comp ¶ 34. In March 2008, however, the fiscal intermediary notified Metro that it could no longer count any days for Medicare-exhausted dual-eligible patients in the Medicaid Fraction. *See* Comp ¶¶ 34 and 36.

**The intermediary excluded Medicare-exhausted dual-eligible patients from the Medic*aid* Fraction because** they were considered "entitled to" Medicare Part A benefits, even if

they were not receiving such benefits, *see* Comp ¶ 35, and *could no longer* receive such benefits (which was the very definition of "Medicare-exhausted"). Metro challenged this determination on the ground that those patients in fact had exhausted their Medicare benefits (which is precisely why Medicaid alone was paying for all their treatment). *See* Comp ¶ 35.

**The intermediary next excluded Medicare-exhausted dual-eligible patients from the Medi*care* Fraction because** they did not receive SSI benefits. *See* Comp ¶ 35.

Due to the exclusion of Medicare-exhausted dual-eligibles from both the Medicaid and Medicare Fractions, the intermediary lowered Metro's DSH percentage from 26.28% to 14.06%, costing Metro about $2.2 million in DSH reimbursement for FY 2005. *See* Comp ¶¶ 34 and 35.

Metro timely appealed the intermediary's FY 2005 DSH determination to the PRRB pursuant to 42 U.S.C. § 1395oo(a). *See* Comp ¶ 37. In July 2008 Metro asked for "expedited judicial review," which is available whenever the PRRB has jurisdiction but the facts are uncontested and the appellant is challenging the validity of a regulation by which the PRRB is bound. *See* Comp ¶¶ 37-39 (citing 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842(f)). Recognizing that it did not have the authority to decide whether the amended regulation is valid, the PRRB granted Metro's request for expedited judicial review in December 2008. *See* Comp ¶ 40 (citing Ex A - *Metropolitan Hospital*, PRRB Case No. 08-2200 (Dec. 16, 2008)).

Metro filed the instant three-count complaint in February 2009. All three counts claim that HHS's enforcement of the amended Disproportionate Share Hospital ("DSH") regulation must be set aside because it is inconsistent with federal statute. **Count one claims that** the amended regulation violates the Social Security Act because it fails to accord different meanings to "eligible

for" and "entitled to", as Congress intended in 42 U.S.C. § 1395ww(d)(5)(F)(vi). *See* Comp ¶ 42. Congress expressed its intent to make Disproportionate Share Hospital ("DSH") funds available to hospitals which serve a disproportionate number of low-income Medicare and Medicaid patients, and HHS contravenes that intent by excluding from the DSH percentage many patients whose care is covered by Medicaid merely because they are also enrolled in Medi*care*. *See id.*

**Count Two claims that** HHS's enforcement of the amended DSH regulation must be set aside under the APA, 5 U.S.C. § 706(2)(C), because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* Comp ¶¶ 44-45. **Count Three claims that** the amended regulation must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because it is "arbitrary, capricious" and "not accordance with law" because it contravenes 42 U.S.C. § 1395ww(d)(5)(F)(vi). *See* Comp ¶¶ 47-48.

**Metro seeks a declaration that the amended regulation, 42 C.F.R. § 412.106(b), violates 42 U.S.C. § 1395ww(d)(5)(F)(vi) in two respects. First, it asks the court to declare that the regulation violates subsection (I), the Medi*care* Fraction provision**, by including in that numerator the days of care provided to patients who are not "entitled to" Medicare Part A benefits (including dual-eligibles who have exhausted their Medicare Part A coverage). *See* Comp, Prayer for Relief, Sec. A unnumbered ¶ 1. **Second, Metro asks the court to declare that the regulation violates subsection (II), the Medi*caid* Fraction provision**, by excluding from that numerator the days of care provided to patients who are "eligible for" Medicaid and not "entitled to" Medicare Part A benefits (including dual-eligibles who have exhausted their Medicare Part A coverage). *See* Comp, Prayer for Relief, Sec. A unnumbered ¶ 2. To rectify these alleged violations, Metro asks the court to enjoin HHS fiscal intermediaries to calculate the Medicaid fraction numerator by

including days provided to patients who are "eligible for" Medicaid and not "entitled to" Medicare Part A benefits (including dual-eligibles who have exhausted their Medicare Part A coverage). *See* Comp, Prayer for Relief, Sec. B. Lastly, pursuant to 42 U.S.C. § 1395oo(f)(2), Metro seeks interest on any DSH funds thus recovered. *See* Comp, Prayer for Relief, Sec. C ¶ 2.

**DISCUSSION**

Plaintiff Metro's Argument.

Metro relies on *Jewish Hospital* (6th Cir. 1994)'s holding defining *entitlement* and distinguishing it from mere *eligibility*:

> [t]o be *entitled* to some benefit means that one possesses the *right* or *title* to that benefit. Thus, the Medicare proxy fixes the calculation upon the absolute right to receive an independent and readily defined payment.
>
> By way of contrast, the Medicaid proxy speaks solely of eligibility.

*Jewish Hospital*, 19 F.3d at 275 (emphasis in original).[2] Metro also relies on the cogent explanation of the Fourth Circuit as to why eligibility and entitlement are not the same:

> In a football game, wide receivers are *eligible* to receive the ball from the quarterback, but none of them is *entitled* to receive it. Similarly, one who receives a letter informing him that he is *eligible* to win ten million dollars in the Publishers

---

[2]

At oral argument, HHS contended that this aspect of *Jewish Hospital* is mere dictum, while Metro Hospital responded that it was essential to the panel's holding. The court need not resolve this disagreement under the circumstances. *See, e.g., Guiberson v. Reconstruction Fin. Corp.*, 196 F.2d 154, 157 (5th Cir. 1952) ("Since we are in agreement with the quoted views of Judge Bailey it is not necessary for us to decide whether or not they are *dicta*."); *United Artists Theatre Circuit, Inc. v. Township of Warrington, Pa.*, 316 F.3d 392, 406 ("Whether or not our post-*Lewis* statements are dicta need not detain us."), *reh'g denied*, 324 F.3d 133 (3d Cir. 2003).

It is true that dictum from a Court of Appeals opinion does not bind this court, *see Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 127 n.2 (6th Cir. 2007) (Merritt, <u>Griffin</u>, D.J. Lawson) (citing *Williams v. Anderson*, 460 F.3d 789, 811 (6th Cir. 2006)). Even if part of the *Jewish Hospital* language favorable to plaintiff's position is mere dictum, however, this court finds it well-reasoned and therefore persuasive.

Clearing House Sweepstakes is sadly mistaken if he thinks he is *entitled* to the money.

In the same vein, a patient who is "*eligible*" for Medicaid becomes *"entitled"* to payment only after using one of the covered medical services. Congress chose the word entitled for the Medicare proxy and the word eligible for the Medicaid proxy. Congress' use of separate words demonstrates it intended for each to have a separate meaning.

\* \* \*

If Congress had wanted to use the word "entitled" throughout the Medicaid proxy as it had in the Medicare proxy, it could – and would – have done so. \* \* \* Congress having chosen the word "eligible" rather than "paid," the Secretary is not at liberty to give the statutory language an entirely different and more restrictive meaning by excluding the patient-days of dual eligibles with exhausted Medicare Part A benefits.

*Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996). *Accord Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996) (Pregerson, Boochever, T.G. Nelson) and *Deaconess Health Servs. Corp. v. Shalala*, 912 F. Supp.2d 438 (E.D. Mo. 1995), *aff'd o.b. without opinion*, 83 F.3d 1041 (8th Cir. 1996) (per curiam) (McMillian, Fagg, Morris Arnold) (both striking down HHS/CMS's interpretation of what "eligible for [Medicaid]" means).

Metro aptly summarizes HHS/CMS's error in conflating eligibility with entitlement, and explains how HHS/CMS is making a related error now:

Finally, in 1999, CMS (then known as [HCFA]) accepted the courts' holdings [including *Jewish Hospital* (6th Cir. 1994)] and issued a Program Memorandum . . . to clarify the definition of Medicaid days in Medicare disproportionate share policy . . . . The Memorandum stated that:

In accordance with 42 C.F.R. § 412.106(b)(4), a day does not count in the Medicare disproportionate share adjustment calculation if the patient was *entitled to both Medicare Part A and Medicaid on that day*.

Therefore, once the eligibility of the patient for Medicaid . . . has been verified, you must determine whether any of the days are *dual entitlement* days and, to the extent that they are[,] subtract them from the other days in the calculation.

[HCFA, Program Memorandum for Intermediaries: Clarification of Allowable Medicaid Days in the Medicare DSH adjustment Calculation, Transmittal A-01-13 (Jan. 25, 2001)] at 2 (emphasis added).

Now, ten years later, <u>CMS is repeating the same mistake of treating the two terms congruently. Whereas previously it had interpreted the term "eligible for" [in the Medicaid Fraction numerator] – incorrectly requiring that the day of care have been paid for by Medicaid – it is now interpreting the term "entitled to" [in the Medicare Fraction numerator] too broadly, incorrectly taking the position that any day of care provided to an individual enrolled in Medicare is a day of care to which they were "entitled" *even if* Medicare coverage was exhausted or otherwise unavailable and [only] Medicaid paid for that day.</u>

As reflected in the earlier court decisions, this interpretation violates a canon of statutory construction that when two different terms are used in close proximity, they mean different things. As noted by the [Fourth Circuit] Court of Appeals in *Cabell*, "Where Congress has chosen different language in proximate subsections of the same statute, courts are obligated to give that choice effect." 101 F.3d at 988 (quoting *United States v. Barial*, 31 F.3d 216, 218 (4th Cir. 1994)); *see also Jewish Hosp.*, 19 F.3d at 275 [6th Cir. 1994] ("Adjacent provisions utilizing different terms, however, must connote [sic, should be denote] different meanings."). * * *

In allocating the exhausted Medicare days of dual eligibles to the Medicare fraction, the amended regulation . . . includes days of care for persons who are no longer "entitled to" Medicare Part A, notwithstanding the federal statute providing that only days of care for those "entitled to" Medicare Part A should be included therein. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

And, in so requiring, the amended regulation bars providers from putting those days where federal statute says they belong – in the numerator of the Medicaid fraction. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) ("eligible for" Medicaid but not "entitled to" Medicare Part A benefits). Simply put, CMS's regulation mandates that providers like Metro Health must do the <u>opposite</u> of what federal law requires.

P's MSJ at 16-17 (italics in original, underlining added for emphasis). Because the plain language

of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II) is unambiguous when accorded its ordinary meaning,

the court has no occasion to consider which side's interpretation better furthers Congressional

"intent" as revealed by legislative history. Because the language of 42 U.S.C. §

1395ww(d)(5)(F)(vi)(I) and (II) is clear and unambiguous, the court must presume that Congress's

intent is revealed exclusively by that language. *See US v. Clintwood Elkhorn Mining Co.*, 553 U.S.

1, ---, 128 S.Ct. 1511, 1518 (2008) (C.J. John Roberts for unanimous Court) ("[A]ny argument that Congress did not mean to require those in the companies' position to comply with the tax refund scheme runs into a powerful impediment, for '[t]he strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances.'") (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991) (quoting *Rubin v. US*, 449 U.S. 424, 430 (1981))).

All the 20-plus pages of defendant HHS's brief do nothing to undermine Metro's straightforward reading of the plain, unambiguous language of the statute and the regulation defining the Medicare Fraction and Medicaid Fraction. *See further* HHS Br at 3-8 and P's Opp/Reply at 3-8. The HHS argument which initially seemed the most promising, founders against the plain, precise language of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II). Defendant HHS argues as follows:

> Plaintiff ignores the statutory definition of what it means to be "entitled to" Medicare Part A benefits, relying instead on its interpretation of case law and congressional intent to support its argument that the regulation is invalid. [E]ntitlement to Medicare Part A benefits occurs automatically for (1) an individual who has turned 65 and (2) is entitled to monthly Social Security benefits under 42 U.S.C. § 402.

> Thus, the statute provides: "Every individual who . . . has attained the age of 65, and is entitled to monthly insurance benefits under section 402 of this title . . . shall be entitled to hospital insurance benefits under part A of this chapter . . . ." 42 U.S.C. § 426(a).

> Nothing in the statute suggests that "entitlement" to Medicare depends upon whether Medicare actually pays for care for an individual for a particular day; rather, because an individual who has exhausted his or her Medicare days for a particular period would still be over 65 and entitled to monthly Social Security benefits, that individual would remain "entitled to" Medicare Part A benefits under the statute.

> The DSH adjustment provision of the Medicare Act also uses the phrase "entitled to" Medicare Part A benefits. To be included within the Medicare fraction, an individual must be "entitled to" Medicare Part A benefits and SSI; to be included within the Medicaid fraction, the individual must "eligible for" Medicaid and not "entitled to" Medicare Part A. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II). While plaintiff

contends that the phrase "entitled to" Medicare must mean that Medicare actually pays for the days in question, the statutory definition of "entitled to" Medicare is not framed in terms of actual payment. Nor has plaintiff provided a reason that the identical phrase in two statutory provisions in the Medicare Act must be interpreted differently. Plaintiff's argument fails as a result.

Def's Br at 14-15. But plaintiff Metro is not asking the court to accord different interpretations of "the identical phrase" in two statutory provisions. The provision on which HHS relies, 42 U.S.C. § 426(a)'s *general* definition of who is "entitled to" Medicare Part A benefits, lacks a short but crucial qualifying phrase that is present in the Disproportionate Share Hospital - Medicare Fraction regulation. The DSH regulation provides that the numerator of the Medicare Fraction

is the number of such hospital's patient days for such period which were made up of patients who (*for such days*) were entitled to benefits under [Medicare] and who were entitled to supplemental security income benefits (excluding any State supplementation) under SSI, and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (*for such days*) were entitled to benefits under [Medicare] . . . .

Plaintiff's argument fails for yet another reason – it ignores what it means to be "entitled to" Medicare Part A benefits. Part A benefits are not limited to inpatient hospital benefits. While an individual hospital stay may no longer be covered under Medicare Part A, the individual would unquestionably be "entitled to benefits" under Medicare Part A and to Medicare coverage if, for example, instead of being in the hospital, that individual were receiving any other Part A service (e.g., skilled nursing facility or home health agency services) during the same period of time (assuming that individual met the specific substantive requirements for coverage of the particular service).

While the same beneficiary's particular stay in a skilled nursing facility or home health services may or may not be covered by Medicare in a particular case, that individual remains "entitled to benefits" under [Medicare] Part A.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added).

Thus, while 42 U.S.C. § 426(a) refers to entitlement to Medicare benefits *generally*, the DSH Medicare Fraction regulation first refers to the "hospital's patient days" and then very precisely and carefully refers to patients who were entitled to Medicare benefits "for such days." In other words,

the DSH Medicare Fraction regulation predicates the calculation of the numerator (partially) and the denominator (entirely) on whether each patient was "entitled to" Medicare Part A coverage *specifically "for such days", i.e., those days of care which the claiming hospital provided to that patient.* In calculating the DSH Medicare Fraction, the statute places *no* significance whatsoever on whether the patient, at the time of the hospital stay, might have still been entitled to benefits for (not exhausted his coverage for) other services outside the hospital, such as skilled nursing facility or home health services. As Metro logically observes, "The focus of the DSH formula on hospital days is unsurprising in light of the fact that it is used to determine an amount to be paid to a *hospital*, not to a nursing facility or home health agency." P's Opp/Reply at 5 n. 2.

It is an elementary canon of statutory construction that where the same Act or statutory framework contains two provisions, the provision which more specifically addresses the situation or context in question prevails over the more general provision. *See Corley v. US*, – U.S. –, 129 S.Ct. 1558, 1561 (2009) ("'[A] more specific statute is given precedence over a more general one.'") (quoting *Busic v. US*, 446 U.S. 398, 406 (1980)); *First American Title Co. v. Devaugh*, 480 F.3d 438, 450 (6th Cir. 2007) (Richard Allen Griffin, J.) ("'One of the most basic canons of statutory construction is that a more specific provision takes precedence over a more general one.'") (quoting *US v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004) (citations omitted)), *reh'g & reh'g en banc denied* (6th Cir. July 12, 2007); *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) ( *Sherrod v. Genzyme Corp.*, 170 F. App'x 375, 379 (6th Cir. 2006) (C.J. Boggs, <u>Batchelder</u>, S.D. Ohio D.J. Herman Weber) ("M.C.L. 445.774(a)(1)'s specific authorization of non-compete agreements trumps the other statutes' inclusion of such agreements within their general prohibition on 'consideration' as a condition of employment."), *reh'g en banc denied* (6th Cir. June 22, 2006)

As the Supreme Court put it just weeks ago, "There is no question that . . . [the] '[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment[.]'" *Bloate v. US*, – U.S. –, – S. Ct. –, 2010 WL 757660, *7 (U.S. Mar. 8, 2010) (Thomas, J., for a six-Justice majority) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

For this reason, the court (and HHS) must apply the plain language of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), which specifically predicates the Medicare Fraction part of the DSH percentage on the patients' entitlement to Medicare Part A benefits *for those patient days in the DSH hospital*, not 42 U.S.C. § 426(a), which speaks far more generally about what it means to be entitled to Medicare Part A benefits.

Moreover, HHS's reliance on 42 U.S.C. § 426(a)'s general definition of entitlement to Medicare Part A benefits is unavailing for a second reason. Another subsection of that same provision actually bolsters Metro Hospital's case on another major issue: what "entitled to" means in this context. As Metro points out, and HHS conveniently neglects to mention, 42 U.S.C. § 426(c) explains just what it is that the people mentioned in subsection (a) are entitled *to*:

> Conditions. For purposes of subsection (a) of this section – (1) entitlement of an individual to hospital insurance benefits for a month shall consist of *entitlement to have payment made* under, and subject to the limitations in, part A of Title XVIII [Medicare] on his behalf for inpatient hospital services . . . .

42 U.S.C. § 426(c) (emphasis added). Similarly, the Medicare statute's provision describing the scope of benefits provides that "[t]he benefit provided to an individual by the insurance program under this part shall consists of *entitlement to have payment made* on his behalf . . . ." 42 U.S.C. § 1395(a) (emphasis added). Both 42 U.S.C. § 426(c) and 42 U.S.C. § 1395(a), then, confirm that the Sixth Circuit panel in *Jewish Hospital* correctly interpreted what "entitlement to" benefits means

in the DSH Medicare Fraction statute (42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)) and the Medicaid Fraction statute (42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)), i.e., that someone who has exhausted his Medicare Part A and therefore no longer has a right to payment of such benefits, is no longer "entitled to" Medicare Part A benefits for purposes of DSH reimbursement.

Moreover, by defining "entitled to benefits" as "entitled to payment of benefits", 42 U.S.C. § 426(c) and 42 U.S.C. § 1395(a) also confirm that the *Jewish Hospital* panel was right to hold that "eligible for" and "entitled to", as used in the DSH statute, are conceptually and practically distinct and *not* to be used interchangeably.  In short, this court is bound to follow the *Jewish Hospital* interpretation of the DSH regulation's phrase "entitled to [Medicare Part A benefits]", and even another subsection of a statute cited by HHS (42 U.S.C. § 426) confirms that *Jewish Hospital*'s interpretation is correct (consistent with the plain language of pertinent statutes, and with accepted canons of statutory construction) in any event.

**Accordingly, plaintiff Metro Hospital is entitled to summary judgment, and to the declaratory, injunctive, and monetary relief which it seeks.**

Because the DSH Medicaid and Medicare Fraction statute (42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II)) is clear and unambiguous, it is unnecessary for the court to look beyond the statute's text for guidance from "legislative history."  *See* Def HHS's Br at 17-20 and P's Opp/Reply at 8-11 (both discussing legislative history).  It would also be inappropriate to do so. The court lacks authority to vary the unambiguous text of a statute on the premise that the legislative history evinces an intent different from the intent necessarily expressed by the actual plain words of the statute as enacted.

## ORDER

Plaintiff's motion for summary judgment [document # 16] is **GRANTED**.

Defendant's motion for summary judgment [document # 18] is **DENIED**.

The court **DECLARES as follows**:

1.    The regulation at 42 C.F.R. § 412.106(b) is invalid and in violation of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) **to the extent that it calls for the inclusion, in the DSH Medicare Proxy a/k/a Medicare Fraction, of** days of care furnished to patients who are not entitled to Medicare Part A benefits (such as patients who were eligible for both Medicare and Medicaid but who, at the time of the relevant "patient days", had exhausted their Medicare Part A coverage).

2.    The regulation at 42 C.F.R. § 412.106(b) is invalid and in violation of 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) **to the extent that it calls for the exclusion, from the DSH Medicaid Proxy a/k/a Medicaid Fraction, of** days of care furnished to patients who are "eligible for" Medicaid but not "entitled to" Medicare Part A benefits (including patients who, on the relevant "patient days", were eligible for both Medicare and Medicaid but had exhausted their Medicare Part A coverage)

The court issues injunctive relief as follows:

For the purpose of calculating hospitals' Disproportionate Share Hospital (DSH) percentages, Defendant **SHALL ALLOW, and SHALL INSTRUCT its fiscal intermediaries to allow each hospital to include, in its DSH Medicaid Fraction numerator,** all days of care furnished to patients who were "eligible for" Medicaid but not "entitled to" Medicare Part A benefits (including patients who, on the relevant "patient days", were eligible for both Medicare and Medicaid but had exhausted their Medicare Part A coverage).

No later than Monday, May 17, 2010, the parties **SHALL JOINTLY FILE** a proposed Judgment, as well as an accompanying notice which shows how the damages and interest were calculated, and specifying the statutory or other authority for any item of interest.

This case remains **OPEN** until further order of the court.

This is a <u>not</u> a final and appealable order, because the court has not yet entered judgment for a sum certain in damages.

**IT IS SO ORDERED** on this  5th  day of April, 2010.

/s/ Paul L. Maloney
Honorable  Paul L. Maloney
Chief United States District Judge